UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| Robert  Brewer, | ) | Civil Case No:  3:14 - CV - 958 |
| Plaintiff | ) | (GLS/DEP ) |
| vs. | ) | |
| | ) | **AMENDED COMPLAINT** |
| | ) | |
| Rutland Herald | ) | |
| Brattleboro Reformer | ) | |
| Officer Hashim, Sgt LaBombard, | ) | |
| JoJo Schwarzauer, personally | ) | |
| Maury Mitchell, personally | ) | |
| Salar Komangar, personally | ) | |
| Sridhar Ramaswamy, personally | ) | |
| Brett Lider, personally | ) | |
| Johanna Wright, personally | ) | |
| | ) | |
| Defendants | | |

U.S. DISTRICT COURT - N.D. OF N.Y.
FILED
JUN 1 0 2015
AT_____ O'CLOCK_____
Lawrence K. Baerman, Clerk - Binghamton

Robert Brewer    6/10/2015
Robert Brewer
PO Box 438
Binghamton, NY  13903
607-768-2132

Table Of Contents

Title Page                                                                          P1

Table of Contents                                                                   P2

Statement of Jurisdiction                                                           P3

Facts                                                                               P7

Causes of Action

    First Cause of Action - Fraud                               P18

    Second Cause of Action - Computer Fraud                     P20

    Third Cause of Action - Cruel and Unusual Punishment        P20

    Fourth Cause of Action - Equal Treatment Before The Law     P20

    Fifth Cause of Action - Erroneous Deprivation               P21

    Sixth Cause of Action - Right to Bear Arms                  P21

    Seventh of Cause of Action - More Oppressive Treatment      P21

    Eighth Cause of Action - Restraint of Trade                 P21

    Ninth Cause of Action - Due Process                         P22

    Tenth Cause of Action - Libel                               P22

    Eleventh Cause of Action - Nonconsentual Appropriation      P24

    Twelfth Cause of Action - Deceptive Business Practices      P24

    Thirteenth Cause of Action - Involuntary Servitude          P26

    Relief Demanded                                             P26

**Statement of Jurisdiction**

Plaintiff respectfully requests to have this case considered as a Federal question pursuant to 28 U.S.C. §1331.  Venue is proper through N.Y. C.P.L.R. §302(a)(3) providing jurisdiction over foreign entities when they commit tortious acts outside the state of New York and regularly do or solicit business in New York.  Plaintiff posits that newspapers conferring criminal convictions on people bereft them, a clerk of court fraudulently maintaining a conviction when it had, according to the certified record, been "SET ASIDE" on direct appeal, the director of a State agency disseminating a criminal conviction to Federal agencies in spite of the "SET ASIDE", State actors erroneously depriving private property based on the fraudulent conviction, and corporate employees falsely insinuating felony activity including capital murder, serial rape, and mass terrorism all qualify as tortious acts under the meaning of the term intended by law.

Defendant newspapers Rutland Herald and Brattleboro Reformer have achieved sales and product distribution to clients in the state of New York in both digital and physical formats.  A continuous, permanent and substantial business transaction between defendant newspapers and the entity known as Newsbank, Inc., makes editions of Rutland Herald and Brattleboro Reformer available to New Yorkers by use of the database known as Access World News. By information and belief, a similar contact with Reed Elsevier brings news content to New York readers through the Lexis/Nexis brand name.  By information and belief, another contact between Cambridge Information Group, brings news content to New York readers through the ProQuest brand name.

The newspapers accept subscriptions from New York clients, print feature stories about New Yorkers in their pages and maintain an interactive website for the marketing of goods and services to New Yorkers, such activities creating sufficient minimum contacts to establish the Court's personal jurisdiction over defendant newspapers.

Jurisdiction may be excercised over officers of the state of Vermont by virtue of Federal questions involving libel with actual malice, fraud, erroneous deprivation, and the alleged infringement and nullification of Federal rights under the Privileges and Immunities clause.

For a fee of $20 any New Yorker can enter their personal data and order a Vermont State Police Report from its Public Information Office (PIO). For a fee of $20, any New Yorker can order a Vermont State Police Photo CD from the same source. For a fee of $45, any New Yorker can order a Vermont State Police Video from the PIO. For a fee of $45 any New Yorker can order a Vermont State Police Audio Recording from the PIO.

N.Y.C.P.L.R §302(a)(1) is a single act statute whereby the Court may exercise jurisdiction over JoJo Schwarzauer on the basis of a transaction between the parties consisting of a payment of a $10 processing fee sent from Plaintiff in New York for a certified copy of a court record mailed to him by the defendant in Alabama. The transaction included supporting telephone calls, the Service of process, the return of Federal form AO 399 waiving Service of Summons, the retention of counsel in Albany, and counsel's filing of a request for guidance with the Court.

JoJo Schwarzauer sells bulk criminal records from her district to information brokers and data aggregators such as Lexis Nexis, law enforcement offices, and Federal agencies in all 50 States. Only 10% of her records are updated to show the final disposition of the case,[1] the worst showing of any State. These outdated records are then used in fee based criminal records searches performed in New York, and in conjunction with background checks, a $4 billion industry as of 2008[2] "that has grown so fast over the last 20 years that no one can say how many companies there are"[3]. New York ranks third behind California and Texas in Gross State Product, with an 8% share of overall U.S. GDP[4]. Extrapolating to the background check market, New York's market share was worth $320 million in 2008. Assuming 5% growth annually for this exploding industry, New York's background check market is $416 million.

For a fee, any New Yorker can obtain outdated criminal records from JoJo Schwarzauer's jurisdiction through KnowX.com, by information and belief, the retail arm of Lexis Nexis

---

[1] Survey of State Criminal History Information Systems, U.S. Dept of Justice, Bureau of Justice Statistics, 12/31/2008 Table 1

[2] Chad Terhune, Business Week, May 28, 2008 "The Trouble With Background Checks"

[3] The New York Times, Opinion and Editorial, P.A24 July 25, 2012

[4] U.S. Bureau of Economic Analysis

(formerly ChoicePoint, Inc.) which performs 10 million background searches annually[5] She is sued in direct connection with the alleged creation of fake criminal records.

The Court may exercise jurisdiction over Maury Mitchell by virtue of Federal questions arising over fraud in the Alabama justice system in connection with dissemination of fake criminal records on the Plaintiff to data and information brokers nationwide, to state and local law enforcement in all 50 states, to the FBI's national crime database, and to Interpol.

The State agency under the directorship of defendant Mitchell competes for a slice of New York's $416 million background check industry through an interactive website in Montgomery, Alabama where it solicits and sells fake background checks to institutional clients nationwide. On the retail side, clients in New York can choose from birth, death, marriage, divorce, obituary, cemetary records and check their own criminal history when they designate their state as "New York", input their personal data, including credit card information, then buy data processed for them while they wait.

Maury Mitchell purposefully avails himself of New York's benefits when he drafts in behind, and attaches to the reputation for quality and dependable research of a. The New York Times, b. The Wall Street Journal, c. Forbes, and d. Family Tree Magazine all of which have corporate and editorial headquarters in New York. Moreover, his agency's criminal records search touts a connection to New York media and targets New Yorkers with the proclamation: "As seen in The New York Times, Forbes, Family Tree Magazine, The Wall Street Journal."

Each of the New York media entities touted by defendant Mitchell is a nationally recognizable brand name. As such, the use of the names and the display of corporate logos of these New York media outlets on the website of the entity under defendant Mitchell's directorship required a New York negotiation to avoid copyright infringement and trademark restrictions. The negotiations for those name and logo display rights constitute "doing business in New York" under the meaning of the term intended by statute.

The displays of New York media logos on the website under the directorship of Maury

---

[5] Op cit, Chad Terhune

5

Mitchell are permanent and continual as opposed to accidental and incidental. They enable customers to derive a vicarious reliability and respectability from their data purchases and are part and parcel of the website's appeal.

Mr. Mitchell's agency, The Alabama Criminal Justice Information Center, is a core NLETS customer along with the New York State Police, exchanging message traffic with New York state and Federal law enforcement when necessary, both sides paying service fees to do so, Plaintiff alleging these service fees constitute doing business in New York. Through its work with NLETS, Defendant Mitchell's agency formed a strategic partnership with CMA Consulting. CMA maintains a corporate office at 19 W. 44th Street, 11th Floor New York, NY 10036.

Defendant Mitchell achieved retail distribution for books on criminal records and statistics published under his agency's imprint through Amazon.com which maintains editorial and publishing headquarters at 1350 Avenue of the Americas (55th Street) New York, NY 10019. Any New Yorker can buy the Crime in Alabama book series published by Mr. Mitchell's agency by opening an account with Amazon, entering address and credit card information, and selecting titles for home delivery. Channel checks with Barnes & Noble and Powell's reveal no other chain taking Mr. Mitchell's book series so the Amazon partnership may be an exclusive deal.

Mr. Mitchell's agency has its own technology laboratory, the Center for Advanced Public Safety (CAPS) at the University of Alabama whose projects are run in support of Mr. Mitchell's agency and require close collaboration with it. CAPS is directed by Dr. Allen Parrish. In 2008 the names of Dr. Parrish and defendant Mitchell appeared on a scientific paper: A Host Architecture For Automobile License Plate Recognition delivered at the IEEE international conference on Intelligence and Security Informatics in New Brunswick, New Jersey. IEEE and another scientific publisher, Springer, co-published the proceedings, Springer's materials appearing in its Springer Lecture Notes In Computer Science series. Springer and its various business divisions have corporate headquarters at 233 Spring Street, New York, NY 10013.

License plate recognition allows law enforcement access to criminal records of drivers. Mr. Mitchell is sued in direct connection with his compilation of fake criminal records, Plaintiff

alleging his records on Plaintiff caused the injuries described herein.

Google, Inc. has offices in New York, does business in New York and Plaintiff respectfully requests the Court to construe that it has sufficient minimum contacts for the court to accept personal jurisdiction over company employees Salar Komangar, Sridhar Ramaswamy, Brett Lider, Johanna Wright. The company's public goals were contravened by the private agenda of these employees, who aimed to injure Plaintiff's reputation, destroy his network of friends and family, ruin his standing among influential groups and libel him to the world. The Court may excercise jurisdiction over these employees by virtue of Federal questions in regard to computer fraud, libel, deceptive business practices and alleged infringement of Plaintiff's 13th Amendment right to be free from involuntary servitude.

## FACTS OF CAUSATION

1. Veet's is a bluesey bar in downtown Mobile, Alabama where biker guys and gals in chrome studded leather jackets mix with 11th Circuit attorneys attired in Brooks Brothers. Police keep a watchful eye, long neck bottles of beer known to land in places they shouldn't.

2. Every Friday night Ellen Cacamis met her girlfriends in Veet's. "I drink so much Miller Lite they don't even ask me what I want anymore," she told Plaintiff in the summer of 2005.

3. Plaintiff met Ellen at a church social on Grelot Avenue in West Mobile, gave her a ride home and watched as she winced noticeably opening the door. "You OK?" Plaintiff said. "Sure. I'll just take my meds," she said.

4. Plaintiff saw a lot of Ellen in 2005 in a relationship combining intimacy and injury for him as well, Plaintiff at one point in such pain he sought the help of Mobile physcian Dr. John Delmas who noted the reason for Plaintiff's visit as "Testicular Pain - Girlfriend." On another occasion, Ellen removed tasseled whips from a closet. "Did you whip Mark?" Plaintiff asked, a reference to Ellen's ex-husband. "I took it easy," Ellen said. "What goes around comes around. Interested?" Plaintiff construing the question to mean was he interested in getting whipped. He demurred.

5. Ellen claimed having her nipples pierced had been even more painful than childbirth, and her

tolerance for pain was tested when her wincing continued unabated. At one point she doubled over in agony. "That's it, you're going to the hospital." Plaintiff said. "I just came from the hospital," Ellen said in September of 2005. "It's my tumor condition. Not cancerous, women get them all the time. Without surgery, they'll kill me."

6. Shocked by the disclosure, Plaintiff went to the University of South Alabama library with its medical databases, typed in "non cancerous tumors women get" as a keyword phrase, and began sifting through the medical literature. Two studies appeared, one from Harvard the other from Howard University. Both ruled out caffene and cigarette smoking causing tumor growth, both fingered alcohol consumption, "especially beer" the Howard study opined.

7. Plaintiff emailed Ellen the research, asking her to modify her drinking. Ellen emailed her girlfriends who weighed in unfavorably. "The nerve of this guy," one response said. "Who does he think he is?" opined another. "What are his real motives," queried a third.

8. Plaintiff emailed Ellen again. Since she and the girlfriends couldn't see the danger of her drinking, the relationship was over. No more house vists, phonecalls or email. Ellen stormed to Plaintiff's residence, arguments ensued, neighbors called the police, Plaintiff was arrested.

9. At a June 16, 2006 bench trial, Plaintiff showed his Ellen email to the Mobile County DA who read it and said "I don't want this." "But that's the evidence," Plaintiff said. Result: Guilty. Direct appeal followed on August 3, 2006. Plaintiff's email to Ellen asking her to stay away and Dr. Delmas' note were presented. The lower court verdict was SET ASIDE (Capitalization by defendant Schwarzauer). Probation, modified downward from 24 months to 6, was completed without incident on February 2, 2007.

10. On November 20, 2008 Plaintiff tested his rights to purchase a weapon at Steve's Shop on 7730A Old Shell Road, West Mobile, AL 36608. He completed the required ATF Form 4473, the proprietor ran the sale through the background check system. There was no objection. Plaintiff was issued store receipt #7272. The store had a firing range, ear muffs, and offered shooting lessons. Plaintiff never took advantage. He'd bought a gun because he could.

11. From time to time, friends suggested he apply for a concealed carry permit. Plaintiff always

8

gave the same answer: he was a researcher, he looked things up.   Libraries were his main haunt, why would anyone need a gun in a library?

## FACTS OF EFFECTS

12. In 2008 the FDIC flew Plaintiff to Washington DC as part of its nationwide search for talent to help deal with the 2008 financial crisis. No employment offer was extended. The Federal Trade Commission reacted favorably to Plaintiff's application then interest dried up.   The Social Security Administration had a post open in its Denver office, with a closure date of 3/07/2012, Job ID: RB-618612-031-12 and Plaintiff made an application answered by email.

13. SSA responded: "all applications receive one of three grades: Qualified, Well Qualified, or Best Qualified.  Based on your documentation, your application is ranked Best Qualified."

14. A second email followed in 2012: "The Social Security Administration does not give points for veterans but it will interview you before any other similarly qualified candidate."

15. Soon after, a third email appeared: "Rather than interview you, we are pulling the position off the job marketplace."   This pattern of early interest then sudden termination of contact continued at the Commerce Dept and other Federal agencies.

16. In April of 2013, Plaintiff travelled to Vermont to hunt for an apartment or house.   He graduated with his friend Mike from Montclair State College in 1970 and Plaintiff travelled to Vermont with the expectation they might become neighbors.

17. He made several stops in Brattleboro and Rutland, and had an offer to let an apartment from a Rutland Vermont landlord but declined the invitation.   Disappointed in the paucity of housing opportunities, Plaintiff decided to leave the state.

18. On the night of April 8, 2013, Plaintiff's car was stopped on the southbound lane of Interstate Highway 91 as Plaintiff was departing Vermont.

19. Plaintiff was in possession of a valid, in-force drivers license and tendered same when asked.

20. Plaintiff was in possession of a valid, in-force vehicle registration card and tendered same when asked.  Plaintiff's registration card did double duty as a receipt for county taxes, state taxes and road fees described to him under separate cover.  It cost 5 times as much as a

Vermont vehicle registration card.

21. Plaintiff was in possession of an in-force auto insurance card and tendered it when asked.

22. By information and belief Vermont State Police ran an NLETS query and NLETS, as it only could, verified Plaintiff's drivers license and vehicle registration as authentic.

23. An officer asked Plaintiff if he had been drinking, and he truthfully responded "No". Vermont State Police made no accusation relative to DUI.

24. Vermont State Police asked if Plaintiff had a weapon in the vehicle. Plaintiff answered "Yes". There was no effort to conceal, evade, mislead or deceive police about the weapon.

25. Police asked to know the location of Plaintiff's weapon and Plaintiff indicated the glove compartment. An officer told Plaintiff that under Vermont law, it was not a crime to posses a weapon, and store it in the glove compartment of a vehicle.

26. A second officer of the Vermont State Police then demanded Plaintiff exit the vehicle.

27. Plaintiff complied and the second officer proceeded to search Plaintiff's person. The officer found nothing of interest on Plaintiff's person.

28. The second officer then declared he had probable cause, giving Plaintiff the choice of either signing a waiver and allowing a vehicle search, or having his car impounded.

29. Plaintiff signed the waiver, whereupon the second officer, along with a third officer then searched the vehicle for about an hour. They found nothing they considered noteworthy.

30. After the search of both his person and his vehicle, the second officer announced "You have a conviction and your weapon is therefore illegal. OK?"

31. Plaintiff responded in a manner allowing dissent without being considered disorderly.

32. "It's not OK. I have no convictions. I disagree in the strongest possible language," Plaintiff said, explaining to another officer, Sgt Treaudeux, the conviction alluded to was set aside on appeal, resulting in no conviction. Sgt Treaudeux asked "When was the appeal?" and Plaintiff said "2005-2006 timeframe." Plaintiff carried in his car the docket sheet showing the appeals court order setting aside the lower court ruling.

33. Police then took Plaintiff's weapon, whereupon Plaintiff asked for a receipt. He drove to the

West Brattleboro State Police Barracks where a receipt was drawn up and given to him.

34. The weapons receipt #13D200877 listed Officer Hashim as the case officer with overall supervision for the highway stop. It also listed Sgt. LaBombard as the officer turning Plaintiff's firearm into the custody of the Vermont State Police.

35. Upon receiving his property receipt, Plaintiff was allowed to leave the scene.

36. In a letter dated June 4, 2014, attorney Jay Ward Brown of the law firm Levine Sullivan Koch and Schultz, LLP, Washington, DC, sent Plaintiff a copy of the official police report issued for the April 8, 2013 highway stop.

37. Mr. Brown also included a separate document entitled "Law Supplemental Narrative" listing Officer Nader Hashim as the author of a Press Release.

38. The Press Release dated April 8 2013, stipulated the time as "approximately 1:30AM", the place as Brattleboro, Vermont, and carried Officer Hashim's name as author. It reported an "INCIDENT: Illegal Possession of Firearm". Capitalization: Vermont State Police.

39. The Press Release dated April 8, 2013 and carrying Officer Hashim's name as author also reports "VIOLATION: Illegal Possession of Firearm." Capitalization: Vermont State Police.

40. The Press Release carrying Officer Hashim's name as author also reports "ACCUSED:" followed by Plaintiff's name. Capitalization: Vermont State Police.

41. The Press Release carrying Officer Hashim's name as author also reports Plaintiff's "CITY, STATE OF RESIDENCE: Transient."

42. Officer Hashim's Press Release also reports "COURT ACTION: No."

43. The Press Release carrying Officer Hashim's name as author reports: "COURT: N/A " construing to mean "Not Applicable".

44. The Press Release carrying Officer Hashim's name as author reports: BAIL: N/A construing to mean "Not Applicable".

45. The Press Release carrying Officer Hashim's name as author reports "Further investigation revealed that Mr. Brewer has a prior conviction of domestic assault which, under federal law, prohibits him from possessing a firearm."

46. Shortly after leaving Vermont, Plaintiff began seeing newspaper stories on Google published by the defendant newspapers purporting to offer accounts of Plaintiff's highway stop.

47. As published on Google, both accounts used the subtitle: "This Just In". Both accounts referred to Plaintiff as a convicted person. Both accounts said, implied, inferred Plaintiff had broken Federal gun laws. Both accounts said Plaintiff was a transient person. Both accounts said Plaintiff is under police investigation for criminal activity. Neither newspaper told readers Plaintiff appealed the verdict. Neither told readers Plaintiff's appeal was successful. Neither paper explained when someone wins on appeal, there is no conviction.

48. In November of 2013 Plaintiff sent a Notice of Claim to Vermont's Attorney General in order to recover his property or receive compensation. No response was forthcoming.

49. In military service, Plaintiff had been a translator in the Albanian language. The University of Michigan published his translation of Albanian novelist Ismail Kadare for the Winter 2011 edition of Michigan Quarterly Review.

50. Hoping to leverage his translation skills into a paid position with the USAID agency, on December 31, 2013, he went to the Metro Center Binghamton office of Congressman Richard Hanna delivering an analysis of Albania's electricity grid. The country had privatized its grid, but electricity theft undermined the project, led to millions in losses and the bill for the fiasco was being presented to U.S. taxpayers. Plaintiff never received any response even though he'd had cordial relations with Congressman Hanna.

51. For years, Plaintiff has had an account and password with Moody's the Manhattan bond rating agency. Moody's gave its first debt rating to Albania on June 29, 2007. By language training and his MBA degree, Plaintiff is perfectly situated to scan Albanian economic news and file business reports with Moody's.

52. Plaintiff is a credited source for Indiana University professor Bernd Fischer's book Albania at War 1939-1945 Purdue University Press, 1999, and he published his own monograph My Albania: Ground Zero, Lion Press, New York, 1992.

53. Mr. Tom Bowen, an attorney for the Binghamton law firm of Coughlin & Gerhart,

telephoned Plaintiff on January 22, 2014 and told him he saw on the Internet one of the articles complained of. Mr. Bowen did not say which paper had published it.

54. Twice in February, 2014 Plaintiff telephoned the officer in charge of internal affairs for the Vermont State Police, Ingrid Jonas, whose number was listed on the Internet, seeking administrative remedy. No one answered the phone on either occasion.

55. On February 7, 2014, Plaintiff called the Vermont State Police at the Brattleboro barracks, seeking administrative remedy. The call lasted 26 minutes during which Plaintiff learned that police can only go by what is on the FBI computer file - respondent avering that even if he had been allowed to show his docket sheets indicating the overturning of a previous lower court ruling, the docket sheets couldn't be used to prevent the seizure of Plaintiff's firearm. The respondent replied that remedy lay with the Plaintiff, not with the state of Vermont.

56. On February 12, 2014 beginning at 2PM, Plaintiff made a series of four telephone calls to the Alabama Criminal Justice Information Center's 800 number seeking information on how to remove a fraudulent conviction from his record. The number was an automated gateway with no person available to take calls and Plaintiff's attempt at remedy were unsuccessful.

57. Failing at administrative remedy with the Vermont State Police and the Alabama Criminal Justice Information Center, Plaintiff learned that he could file a criminal history challenge to the FBI's criminal records database.

58. On February 20, 2014 Plaintiff wrote to the FBI's Criminal History Analysis Team at its West Virginia headquarters alleging fraud in the compiling, maintenance, distribution of his records dating back to the year 2006, pointing out he was being scammed because records contained a lower court conviction while ignoring a successful appeal.

59. Plaintiff's February 20 letter was answered by Joseph W. Sensibaugh, Acting Section Chief of the FBI's Criminal Justice Information Services Division in a letter dated March 4, 2014.

60. Mr. Sensibaugh sought more information from Plaintiff, telling him "most States" have agreements with the FBI requiring use of criminal records challenge services from States before using the FBI's criminal challenge service. He did not say Alabama was such a State

requiring two criminal records challenges, one from the State, another from the FBI.

61. On March 10, 2014 using Postal Money order #21609132120 Plaintiff sent Mr. Sensibaugh an $18 processing fee along with a set of his fingerprints to assist the agency in completing its investigation.

62. At the end of March, Mr. Sensibaugh again wrote to Plaintiff informing him that, on his behalf, an FBI representative had contacted the Alabama Criminal Justice Information Center in Montgomery, Alabama headed by defendant Maury Mitchell and that Plaintiff's criminal records challenge had failed, and a non-Federal conviction remained on his record.

63. On April 1, 2014 Plaintiff made a series of three telephone calls to the main number of the Alabama Criminal Justice Information Center demanding to know why his FBI records challenge had failed. These efforts at uncovering the reasons were unsuccessful.

64. On April 1, 2014 Plaintiff telephoned defendant Schwarzauer's office in Mobile, Alabama, asking for instructions on how to obtain a certified copy of his record. Plaintiff explained he was getting URL error messages for the 13th Circuit website for Mobile, Alabama which seemed to be down, and therefore he decided to call. "The website is up" the respondent said haughtily. "We have no problems with it." Not wanting to argue about a website, Plaintiff simply asked how to obtain a certified copy of his record. "A conviction?" the respondent asked. "It was overturned on appeal." Plaintiff said.

65. The call lasted 8 minutes during which Ms Schwarzauer's office researched Plaintiff's records and he was told the amount of the processing fee and where to send it.

66. Shortly thereafter, Plaintiff mailed a written request to defendant Schwarzauer for a certified copy of his record along with a U.S. Postal money order to cover the $10 processing fee.

67. In a letter mailed to Plaintiff and carrying an April 10, 2014 postmark, defendant Schwarzauer sent Plaintiff a certified copy of his record.

68. The certified copy was dated April 8, 2014 and carried the statement by defendant Schwarzauer "I....certify that this is a true and accurate copy/copies of the judgement..."

69. The certified copy of the record also contained the statement "Defendant must stay away

from the victim for 6 months."

70. Page 3 Line 3 of the certified copy of Plaintiff's record issued by defendant Schwarzauer contained the entry "Order of 6/6/06 is ordered set aside," construing to mean a lower court order issued on 6/6/06 was being overturned.

71. Page 4 of the certified copy issued by defendant Schwarzauer contains the hand written notation: "SET ASIDE".  Capitalization is by the office of defendant Schwarzauer.

72. The certified copy of the record indicates there was no lower court order issued on 6/6/06.

73. The certified copy of the record indicates the actual date of the lower court order was 6/16/06, a full ten days after the date certified by defendant Schwarzauer.

74. On June 26, 2014 Plaintiff took a Greyhound bus from Binghamton to Philadelphia to stay with Vermont friends Mike and Bonnie.  On June 27, just before dinner, they both took out smartphones and Googled Plaintiff's name.  Bonnie came across nothing, Mike encountered the newspaper articles on his smartphone and began reading them. He mentioned Plaintiff's name as having a prior conviction.

75. "That's a false statement" Plaintiff said.

76. "A transient" Mike continued.

77. "That's a false statement," Plaintiff responded.

78. "Who violated Federal gun laws," he continued.

79. "That's also a false statement," Plaintiff responded.

80. On August 2, 2014 Ms.Schwarzauer was served with Plaintiff's Complaint 3:14-CV-958 (GLS/DEP) at her address of record in Mobile, Alabama along with a Federal Waiver of Service of Summons form AO 399.

81. Her office returned the AO 399 to Plaintiff who forwarded it to Mr. Baerman, Clerk of Court.

82. Ms. Schwarzauer was assigned the date of October 3, 2014 to answer Plaintiff's complaint.

83. October 3 came and went with no response.  Plaintiff filed a Motion for Summary Judgement against all defendants, serving them with Motion papers the receipts for which were filed with the Clerk of Court.   The Motion was denied as Premature, with Leave to Refile.

15

84. On August 19, 2014 The Wall Street Journal wrote that Google was scaling back its reliance on the criminal records of American citizens and reducing the weight accorded to them in the company's algorythm that tracks and monitors American citizens in order to help them reach their full potential as citizens and lead more meaningful lives.

85. To help Plaintiff reach his full potential, defendants Salar Komangar, Sridhar Ramaswamy, Brett Lider, and Johanna Wright linked Plaintiff to murderers, rapists, child molesters, cocaine addicts and an individual who "demanded a prostitute perform fellatio on his person at the point of a double barreled shotgun."

86. The methods deployed by the defendants included surgically altering and engineering images and likenesses of other people then fusing, splicing, and mixing Plaintiff's name underneath images of known felons in order to create new scientifically concocted identities, upon which they grafted a variety of heinous crimes.

87. John Doe #1 is the poster boy for this bold new world of scientifically engineered social deviance. He shares two of Plaintiff's names and thus is an ideal candidate for the switch of identities the defendants conspired to contrive.

88. John Doe #1 had been arrested for sexually abusing a minor child, a charge which was plea bargained down to simple assault of a minor child.

89. The Google employees stripped Mr. Doe's name from his photograph and replaced it with Plaintiff's name then disseminated the new picture over the Internet using defendant Salar Komangar's Google Images product.

90. Google's robot, The Googlebot, found other suitable donor identities, stripped the donor's name, fused Plaintiff's name onto the donor's photograph, then disseminated the new identity over the Internet using Google Images software.

91. By late 2010, Plaintiff was represented on Google Images by a bevy of criminal portraits all of which were created by the fusing and mixing procedures initially adopted for John Doe #1.

92. In 2012, Plaintiff began seeing his name under the image and likeness of John Doe #1. He pressed the "Report this Image" key on his computer, reporting the image to Google.

16

93. John Doe #1's image and likeness appeared so persistently under Plaintiff's name he filed a police complaint. Police witnessed Plaintiff reporting the image of John Doe #1 to Google.

94. Plaintiff received a message from Google after reporting the image of John Doe #1: "Thanks for your feedback." The company took no other action.

95. Some time after learning John Doe #1's identity, Plaintiff called the jurisdiction hosting the image asking to be separated from the prisoner displayed under Plaintiff's name.

96. The jurisdiction left a phone message for Plaintiff: "We can't do that, this person is of interest to us" or words to that effect, adding: "That's just Google playing games with you."

97. Plaintiff made a printout of John Doe #1's image and the associated computer code.

98. He inquired at the Binghamton University Computer Help Desk, as to whether the code was written in HTML (Hypertext Markup Language). The Help Desk assured him the code was not HTML but instead was Google's own proprietary search engine query language.

99. The search language used the word "Fuse" followed by the letter "F" and a bitmap image of John Doe #1, the person whose image he reported using the "Report" button.

100. From 2012 to 2015 the Google defendants forced Plaintiff to web host the image and likeness of individuals convicted of crimes of force and violence as follows: capital murder, the deaths of persons by a weapon of mass destruction, serial rape, forcing a prostitute to perform fellatio at the point of a double barreled shotgun, assault on a female, child molestation, and failing to register as a sexual predator.

101. From 2012 to 2015 the Google defendants forced Plaintiff to web host the images and likeness of individuals convicted of crimes involving illegal and controlled substances as follows: possession of cocaine with intent to distribute, possession of illegal drugs, cocaine and liquor possession by a person under 21.

102. From 2010 to 2015 the Google defendants forced Plaintiff to webhost the image and likeness of individuals convicted of crimes of guile and deception as follows: forgery first degree, identity theft, larceny, larceny by employees and other servants, and unlawful distribution.

103. From 2010 to 2015 the Google defendants forced Plaintiff to webhost the image and likeness

of individuals convicted of crimes of disorderly conduct as follows: public intoxication resulting in a civil disturbance, parole violation.

104. From 2010 to 2015 the Google defendants forced him to webhost advertisements for the following products: Nazi officers of the Third Reich, Nazi artwork and memorabilia, human mutilation, defilement and disembowelment, the consumption of alcoholic beverages, books touting human and animal excrement.

105. From 2010 to 2014 the Google defendants forced him to webhost images touting, illustrating, and mimicking evil thus parodying Google's motto: "Do No Evil".

106. From 2012 to 2014 the Google defendants fused, spliced, and merged his name to comments written by the individual known as "smichael" in order to depict Plaintiff as a racist.

107. From 2012 to 2014 the Google defendants fused, spliced, and merged his name to comments written by the individual known as "The Literary Lioness" in order to depict Plaintiff as a someone glorifying drunken revelry and debauchment.

108. In no case enumerated above did the named Google defendants solicit Plaintiff's acquiescence, input or approval.  In no instance enumerated above was Plaintiff compensated for web hosting the persons, products and/or promotional activities chronicled herein.

## First Cause of Action - Fraud

109. Plaintiff alleges the Mobile County DA suppressed exculpable evidence (Para 9 lines 1-2) at Plaintiff's June 16, 2006 trial, making Plaintiff's lower court conviction a fraud.  He alleges the conviction is again fraudulent because on August 3, 2006 it was SET ASIDE (Para 9 line 4) on direct appeal. He alleges the conviction became fraudulent a third time when Maury Mitchell induced the FBI to reject Plaintiff's criminal records challenge (Para 62).

110. Plaintiff alleges defendants Schwarzauer and Mitchell defrauded Plaintiff to the government of the United States through its crime fighting agency, the FBI, reporting as they did a lower court conviction (Para 9 lines 2-3, Para73) but intentionally withholding Plaintiff's sucessful direct appeal (Paras 9, 70, 71), causing the FBI to tell Plaintiff he still had a non-Federal conviction on his record (Para 62 line 4) even though he won his case.

111. Plaintiff alleges defendants Schwarzauer and Mitchell defrauded Plaintiff to the State of Vermont through its crime fighting agency the Vermont State Police by reporting to the FBI a lower court conviction (Paras 9, 73) but intentionally withholding his sucessful direct appeal (Para 9, 70, 71), and causing defendant Sgt. LaBombard to seize Plaintiff's property (Para 34-39) even though Plaintiff won his case on appeal and therefore had no conviction.

112. Plaintiff alleges that Para 68 indicating Plaintiff "must stay away from victim" is fraudulent because Ellen Cacamis was no victim, but a sexual predator who injured herself (Para 2 line 1, Para 5 lines 1, 3-5, Para 6 line 5, Para 7 line 1) and those around her (Para 4 lines 3-7) before going to Plaintiff's residence (Para 8, lines 2-3) to start a civil disturbance.  Plaintiff proved to the satisfaction of the trier of fact that he was the victim.  Without such proof, the lower court verdict would not have been SET ASIDE.

113. It is a prevarication for JoJo Schwarzauer to write there was a lower court conviction dated 6/6/06 (Para 70 lines 2-3)  The actual date was 6/16/06.

114. Plaintiff alleges Para 68 is fraudulent because defendant Schwarzauer never SET ASIDE the lower court conviction on her records as mandated by the trier of fact, but instead let the lower court conviction stand.  Plaintiff alleges further defendant Schwarzauer never updated Plaintiff's record to show the final disposition of his case because doing so would mean one less criminal record she could sell to databrokers and database accumulators.

115. Plaintiff relied on the professionalism of the Alabama defendants to accurately convey the truth of the transaction. Instead, he was greviously injured by being shut out of the job market from the years 2006-2015, incurring physical and psychological devastation, shame and disgrace, and loss of his property in Vermont in 2013.

116. Plaintiff avers malice and wanton behavior on both JoJo Schwarzauer and Maury Mitchell in maintaining a conviction on Plaintiff's record after it was SET ASIDE on direct appeal.

117. Plaintiff alleges Officer Hashim's Press Release Report (Paras 37-45) was fraudulent in its entirety because it was based on a conviction that was SET ASIDE on direct appeal - only the fraud of defendants Schwarzauer and Mitchell keeping it on the books as a conviction.

19

Plaintiff alleges Officer Hashim's Press Release Report (Para 41): "CITY, STATE OF RESIDENCE: Transient" was fraudulent because Plaintiff presented valid documentation (Paras 19-22) and the NLETS system confirmed his documentation as authentic.

### Second Cause of Action - Computer Fraud

118. Plaintiff alleges defendants Schwarzauer and Mitchell created, and both the FBI and the Vermont State Police relied upon, an electronic file to place a non-Federal conviction on Plaintiff's record and to subsequently seize and confiscate his property which contained material misrepresentations such that Plaintiff's Federal right to be free from computer fraud under the Stored Communications Act and other Federal statutes was infringed.

119. Plaintiff alleges further BRETT LIDER and other UX Designers known to him defrauded Plaintiff by fusing and mixing Plaintiff's name with the image and likeness of other persons in conflict with the criminal justice system (86-107). Plaintiff alleges further Mr. Lider completed his fraud by stealing Plaintiff's identity and fusing it with images of Nazi officers, memorabilia, and artwork.

120. Plaintiff alleges Mr. Lider's frauds were perpetrated with malice and ghoulish intent and he personally delighted in creating criminal histories and attributing them to Plaintiff.

### Third Cause of Action - Cruel and Unusual Punishment

121. Plaintiff alleges by changing his case outcome from SET ASIDE on direct appeal to a conviction sua sponte, JoJo Schwarzauer and Maury Mitchell violated Plaintiff's 8th Amendment right to be free from cruel and unusual punishment. Plaintiff alleges changing the terms of probation from 6 months to a lifetime conviction sua sponte, defendants again violated Plaintiff's 8th Amendment right to be free from cruel and unusual punishment.

### Fourth Cause of Action - Equal Treatment Before The Law

122. Plaintiff alleges Ellen Cacamis was no victim but a predator inflicting pain on herself and those around her (Paras 2-7) before creating a civil disturbance with Plaintiff. He alleges her designation as a "victim" (Para 69) was political not evidentary. Plaintiff proved to a trier of fact that **HE** was the victim - without such proof the lower court decision would not have

been SET ASIDE.    Plaintiff alleges by conferring "victim" status on Ellen, defendant Schwarzauer violated Plaintiff's 14th Amendment right to equal treatment before the law.

## Fifth Cause of Action - Erroneous Deprivation

123.Plaintiff alleges the confiscation of his firearm by Sgt. LaBombard (Paras 34, 38, 39), relied on fraudulent records compiled by defendants Schwarzauer and Mitchell, and thus Sgt LaBombard's seizure of Plaintiff's firearm constituted an erroneous deprivation.  He alleges the initial fraud of defendants Schwarzauer and Mitchell and the subsequent seizure by Sgt LaBombard were carried out by State actors operating under color of State law.

## Sixth Cause of Action - Right To Bear Arms

124.Plaintiff alleges since he won his case on direct appeal (Paras 9, 68, 69) he was not a "Prohibited Person" precluded from purchasing a firearm under the meaning of the term intended.  Plaintiff also alleges he passed a National Instant Background Check (Para 10) on November 20, 2008.  He alleges further that the confiscation of his firearm by Sgt. LaBombard (Paras 34) relied on fraudulent records compiled and disseminated by defendants Schwarzauer and Mitchell,  and that Sgt LaBombard's seizure of Plaintiff's firearm thus infringed his Second Amendment right to bear arms.

## Seventh Cause of Action - More Oppressive Treatment

125.Plaintiff alleges he travelled to Vermont under the auspices of the Privileges and Immunities clause protecting travelling citizens.  He alleges Officer Hashim's "transient" label (Para 41) was made to ridicule, deride and denigrate and constituted more oppressive treatment than a Vermont resident receives since Vermonters are not considered transients when shopping for apartments. He alleges Officer Hashim's Press Release Report "COURT ACTION: No" (Paras 42-43) was more oppressive treatment because a Vermont resident would have received a court date.  Plaintiff alleges Officer Hashim's actions in the manner described infringed his rights under the Privileges and Immunities clause.

## Eighth Cause of Action - Restraint of Trade

126.Plaintiff alleges defendant Mitchell used his influence to achieve a law, agreement, accord

21

requiring Plaintiff to use the criminal records challenge service of his agency (Para 58-60) priced at $25 rather than a similar criminal records challenge product offered by the FBI priced at $18, and that the law, agreement, accord achieved by defendant Michell is anti-competitive and in restraint of trade, seeking as it does to screen out a lower priced product while insuring an income stream for Mr. Mitchell's agency.  Plaintiff alleges he was injured by this monopolistic practice when Mr. Mitchell used the law, arrangement, accord to induce the FBI to reject Plaintiff's criminal history challenge (Para 60).

## Ninth Cause of Action - Due Process

127. Plaintiff alleges Officer Hashim's denial of a court date "COURT ACTION: No" and "Court: N/A" (Paras 42-43) infringed his 5th Amendment Due Process right to go before a magistrate when accused, explain his circumstances, and possibly retrieve his property.

## Tenth Cause of Action - Libel

128. Plaintiff alleges Domestic Violence is a "serious crime" under the meaning of the term intended, as is violation of Federal gun laws.  Plaintiff alleges capital murder, serial rape, causing deaths of persons by a weapon of mass destruction, non-consensual fellatio at gunpoint, child molestation, assault on a female, possession of cocaine with intent to distribute are also "serious crimes" under the meaning of the term intended by statute.

129. Plaintiff alleges he is not a public figure and has no duty to prove actual malice.

130. Plaintiff alleges for "serious crimes" he has no duty to prove special damages since damages are per se.  If he is incorrect and needs to plead special damages he alleges the de facto blacklisting from the job market (Paras 12-15) allegedly caused by JoJo Schwarzauer and Maury Mitchell, and Plaintiff's attempts to resusitate his Albanian language translating career (Paras 49-52) satisfies the special damages requirement.

131. Plaintiff alleges defendant newspapers Rutland Herald and Brattleboro Reformer are Internet Content Providers (ICP's) under the meaning of the term intended by the Communications Decency Act 47 U.S.C. § 230 and use an "aggregate communication" to wit: the Internet to

re-publish their stories about him daily, continue their libel of Plaintiff, and interfere and undermine his efforts to establish his credentials as an Albanian translator.

132. Plaintiff alleges defendants Schwarzauer and Mitchell libeled him to the government of the United States, reporting to the FBI a lower court conviction but intentionally withholding a successful direct appeal (Para 70-71) causing the agency to publish a non-Federal convicton for Plaintiff on its national crime database (Para 62). He alleges said publication resulted in his de facto banishment from the U.S. job market (Paras 12-16, and undermines all his efforts to establish himself as a qualified Albanian language translator (49-52).

133. Plaintiff alleges JoJo Schwarzauer and Maury Mitchell libeled him to Vermont State Police on April 8, 2013 by reporting on his FBI record a conviction SET ASIDE on direct appeal. Plaintiff alleges their libel caused Sgt LaBombard to confiscate Plaintiff's property, (Paras 30-34) Officer Hashim to accuse Plaintiff of violating Federal gun laws, and newspapers Rutland Herald and Brattleboro Reformer to expose him to ridicule, shame and disgrace.

134. Plaintiff alleges defendants Schwarzauer and Mitchell libeled him to data brokers, data miners, information brokers, and law enforcement offices nationally by recording a conviction on his FBI record that was SET ASIDE on direct appeal, causing a libel whereby Plaintiff suffered job opportunity loss for the years 2006-2014, as well as shame and disgrace, physical, emotional, and psychological distress, and property loss in Vermont.

135. Plaintiff alleges Officer Hashim libeled him by authoring a Press Release Report (Paras 38-45) containing untrue and inaccurate statements about him directed at and published by defendant newspapers: Rutland Herald and Brattleboro Reformer, said libel hurting his efforts at establishing himself as an Albanian translator as described in Paras (49-52).

136. Plaintiff alleges Officer Hashim in his Press Release libeled him to third party information brokers, databrokers and web based dataminers who buy criminal records citations from law enforcement agencies. Plaintiff alleges Officer Hashim's Paras statements exposed him to hatred, contempt, aversion, and induced an evil unsavory opinion of him in the minds of a substantial number in the community. Plaintiff alleges Officer Hashim's Paras Press Release

23

subjected him to shame, disgrace, ridicule, contempt and emotional distress in the extreme.

137. Plaintiff alleges defendant newspapers Rutland Herald and Brattleboro Reformer libeled him when they published Officer Hashim's Press Release as cited, all statements therein being false and inaccurate to the core. Plaintiff alleges further the articles subjected him to shame, ridicule, disgrace, loss of reputation, physical, emotional and psychological distress in the extreme, and the loss of his property.

138. Plaintiff alleges the libel of defendant newspapers lowered him in the estimation of influencial groups and contacts (Paras 49-53) and disparaged him in his office, profession and trade by making it impossible to cultivate contacts needed to further his career.

139. Plaintiff alleges the libel of defendant newspapers subjected him to added scrutiny and suspicion by friends as depicted in Paras 74-79.

140. Plaintiff alleges all Google employees libeled Plaintiff by falsely insinuating he committed the crimes described (Paras 100-107).

141. Plaintiff alleges in each and every aspect, he satisfied the requirements of CPLR 3016(a).

### Eleventh Cause of Action - Nonconsentual Appropriation

142. Plaintiff alleges the flood of advertisements under Plaintiff's name by SRIDHAR RAMASWAMY'S Ads and Commerce division as alleged in Para 104 are "nonconsensual commercial appropriations of the name, portrait or picture of a living person" and that Dr. Ramaswamy thus infringed Plaintiff's New York Civil Rights Law §§ 50-51 Right to Privacy.

### Twelfth Cause of Action - Deceptive Business Practices

143. Plaintiff alleges the failure of defendant newspapers Rutland Herald and Brattleboro Reformer to disclose to readers a: that Plaintiff appealed his case, b: that his appeal was successful, and c: that a successful appeal results in "No Conviction" are all deceptive business practices under the meaning of the term intended by NY GBS §349.

144. Plaintiff alleges that defendant newspapers Rutland Herald and Brattleboro Reformer insisting he violated Federal gun laws when he had not, insisting there was an ongoing

24

investigation when there was none, and ommiting the conclusion of an alleged "ongoing investigation" are also deceptive business practices under NY GBS §349.

145. Plaintiff alleges the false insinuations by the Google defendants regarding felonious activities chronicled in Paras 98-108 are deceptive business practices under NY GBS §349.

146. Plaintiff alleges Google Images, the product complained of in this action, is one of a bevy of products in SALAR KOMANGER'S Products Division. Plaintiff alleges by using Google Images to fuse and splice Plaintiff's name to the image of persons convicted of capital murder, serial rape, mass terrorism, copulation at the point of a shotgun, Nazi officers and memorabilia, speculations on evil, excrement, human disfiguration and disembowelment, defendant Komangar infringed Plaintiff's rights under NY GBS §349.

147. Plaintiff alleges Google employee JOHANNA WRIGHT, as Management Director for Web Search with responsibility for supervising and administering search products at Google, used deceptive business practices allowing search products to fuse, graft, and splice Plaintiff's name with the criminal histories of other people, infringing his rights under NY GBS §349.

148. Plaintiff alleges Google employee BRETT LIDER, a Product and User Experience Designer with responsibilities for User Feedback, issued the digital response, "Thanks For Your Feedback" then disregarded Plaintiff's advisory his name was being attached to John Doe #1's image and likeness. Plaintiff alleges that Mr. Lider's employer supplied the "Report This Image" button for the express purpose of removing objectionable imagery and by refusing to disconnect Plaintiff from activities chronicled in Paras 98-108 Mr. Lider deployed deceptive business practices in contravention of Plaintiff's rights under NY GBS §349.

### Thirteenth Cause of Action - Involuntary Servitude

149. Plaintiff alleges the Google defendants forced Plaintiff to webhost the images and likenesses of persons convicted of felonies (P 100-102), never paying him for this work, thus infringing Plaintiff's 13th Amendment right to be free from involuntary servitude. Plaintiff alleges he was never convicted of a crime punishable by involuntary servitude. He alleges his repeated demands that Google employees cease their behavior and their refusal to do so

satisfy the coersion standard of the law.

150. Plaintiff alleges the advertisements by SRIDHAR RAMASWAMY'S Ads and Commerce division (Para 104) were also forced upon Plaintiff without his acquiesence, consent, or compensation.    Plaintiff re-alleges the forced webhosting of advertisements by Dr. Ramaswamy infringed his 13th Amendment right to be free from involuntary servitude. Plaintiff re-alleges he was never convicted of a crime for which involuntary servitude served as punishment.    He re-alleges Dr. Ramaswamy's persistence in forcing this behavior upon him despite his numerous protestations satisfy the coersion standard of the law.

### Relief Demanded

151. WHEREFORE, ad damnum, Plaintiff seeks damages and relief as follows: Enjoinment, estoppel, and preclusion by defendants JoJo Schwarzauer and Maury Mitchell from the use of fraudulent data and material misrepresentations concerning Plaintiff's conviction record.

152.Enjoinment and estoppel by the State of Vermont, its agents and employees from the further use and abuse of fraudulent data rife with material misrepresentations concerning Plaintiff.

153.Enactment of NYCPL 160.60 stipulating that when an individual wins on direct appeal as Plaintiff did, a person's legal status is reset to where it was prior to arrest.

154.Enjoinment by Rutland Herald and Brattleboro Reformer from depicting Plaintiff as violating Federal gun laws and as a person convicted of domestic violence.

155.Emancipation from involuntary digital servitude.  Reparations for involuntary service.

156. A money judgement for physical, emotional and psychological suffering at the hands of these defendants whose defamation caused the loss of friends, property, employment, and professional contacts due to the shame and disgrace they took delight and sport inflicting.

157. And for such other, further, and different relief which to the Court seems just and proper.

Robert Brewer, Binghamton, NY

26